Manufacturers Shook Sales Corporation v. Commissioner.
Manufacturers Shook Sales Corp. v. Commissioner
Docket No. 24024.
United States Tax Court
1951 Tax Ct. Memo LEXIS 354; 10 T.C.M. (CCH) 42; T.C.M. (RIA) 51014; January 17, 1951
*354 John C. Doyle, Esq., 16 Court St., Brooklyn 2, N. Y., for the petitioner. Scott A. Dahlquist, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in declared value excess profits tax and excess profits tax for the calendar years 1943 and 1944 as follows: Declared
Value Excess
Excess
Profits Tax
Profits Tax
Total
1943
$1,526.53
$ 9,972.75
$11,499.28
1944
1,884.77
11,191.61
13,076.38
The only question to be decided is whether the amounts of $46,500 and $49,400 represent a reasonable allowance for compensation for the services of the president of the petitioner in the years 1943 and 1944, respectively, under section 23 (a) (1) (A) of the Internal Revenue Code. The foregoing amounts were paid by the petitioner and were deducted in its income tax returns for the taxable years. The respondent allowed a deduction of $35,000 in each year, and determined that the compensation paid was more than "reasonable," or excessive, to the extent of $11,500 in 1943, and $14,400 in 1944, which amounts he disallowed as deductions. The petitioner *355 does not contest other determinations and adjustments made by the respondent in his determination of deficiencies in declared value excess profits tax and excess profits tax. The respondent determined that there are overassessments of income tax in each taxable year. This Court has no jurisdiction over overassessments. Petitioner filed its returns with the collector for the second district of New York in New York City. Findings of Fact The facts which have been stipulated are found as facts. Walter A. Richardson is the president of the petitioner, one of its directors, its sole managing executive, and the producer of almost all of its income. He has carried on the business of the petitioner corporation since 1932. In 1943 he owned all of the outstanding capital stock which amounted to 51 shares. In 1944, 45 shares of stock were issued to Richardson's wife, son, and daughter in amounts of 15 shares to each, increasing the outstanding stock to 96 shares. The new stockholders became directors. Substantially all of the income of the petitioner corporation is derived from Richardson's selling operations. He is an experienced and skilled selling agent, specializing in negotiating *356 purchase and sales transactions between buyers and sellers of box shooks, which are the cut boards which are assembled in the making of wooden boxes. Richardson has been engaged in that business since 1919. He is the only selling agent in the area of New York City who specializes in the business of acting as a selling agent, dealing in box shooks, with the exception of one other small selling agent. The compensation for the services of arranging purchase and sales transactions between producers and buyers of box shooks consists of a commission based upon the dollar amount of the contracts which are negotiated. The petitioner corporation receives those commissions. The business of the petitioner is a personal service business. The petitioner does not own any physical assets excepting office furniture and fixtures. It does not own, buy, or deal in any materials or inventories of goods. It does not require capital in the conduct of its business. At the beginning of 1943 its earned surplus and undivided profits amounted to $42.84. During 1941, 1942, 1943 and 1944 the employees of the petitioner, other than Richardson, were an office manager, two stenographers, and one salesman, Tantum, *357 who negotiated contracts between buyers and sellers of box shooks for fish products boxes. The four employees were paid straight salaries. Richardson was the chief executive who directed the four employees in addition to carrying on the major work of selling agent. During 1943 and 1944 the total number of contracts which Richardson and Tantum negotiated as selling agents covered carload shipments of box shooks in the amount of 446 carloads in 1943, and 457 carloads in 1944, and the respective contracts negotiated by Richardson and by Tantum, measured by carload shipments of materials were as follows: Carload Shipments of Sellers
1943
%
1944
%
Richardson
412
92%
405
86%
Tantum
34
8%
52
14%
Total
446
100%
457
100%
Tantum's straight salary was $3,425 in 1943, and $3,835 in 1944. Richardson was paid about $100 per week as a drawing account and received at the end of each year the chief amount of compensation for his services. His monthly withdrawals totalled $4,900 in 1943, and $5,200 in 1944. The total salaries of the three office employees amounted to $5,638 in 1943, and $8,035 in 1944. The total expenses of the petitioners for rent, *358 taxes and miscellaneous items including four employees' salaries and Richardson's monthly withdrawals totalled $23,364.86 in 1943, and $29,899.99 in 1944. Petitioner's gross income in the taxable years was as follows: Other
Commissions
Income
Total
1943
$82,091.32
$4,456.95
$86,548.47
1944
91,023.37
5,680.51
96,703.88
The petitioner paid Richardson $41,600 at the end of 1943, and $44,200 at the end of 1944 for his services, which was in addition to his monthly withdrawals. His total compensation for each year was $46,500 and $49,400, respectively. After payment of the entire amount of Richardson's compensation, the net taxable income which the petitioner reported in its income tax returns was $21,583.41, for 1943; and $22,603.89 for 1944. No dividends were paid to stockholders in either year. The petitioner paid dividends to stockholders for the first time in 1945, and thereafter in each year through 1950. The petitioner received commissions in 1943 and 1944 on contracts in the gross dollar amount of $1,000,428, and $1,169,860, respectively. The commissions received in 1943 represented 8 per cent of the total dollar amount of the contract *359 negotiated in 1943, and 7.8 per cent of the dollar amount of the contracts negotiated in 1944. In 1940, 1941, and 1942, the gross dollar amount of contracts for the sale of box shooks on which sales commissions were paid to the petitioner was as follows: 1940
$260,078
1941
349,222
1942
288,561
During 1943 and 1944 the demand for box shook material was great, and the work of Richardson included locating sources of supply, as well as receiving orders from buyers. Before World War II, one-half of the sales contracts which Richardson negotiated was with departments and agencies of the United States Government, and one-half was with private concerns. During 1943 and 1944, all of the contracts which Richardson negotiated were to provide Government departments with box shooks either under contracts between suppliers and Government departments or under contracts between suppliers and private concerns who had priority ratings, and who had contracts with Government departments. Sixty-five per cent of petitioner's business during the taxable years consisted of negotiating contracts with Government departments, and 30 per cent (more or less depending upon the contracts obtained *360 by the salesman who handled only fish box orders) consisted of negotiating contracts with private concerns who had Government contracts and priorities. Richardson handled the preparation and filing of bids for contracts, freight charges, and pricing. Also, he attended to the shipping problems of the sellers of box shooks under the contracts which he negotiated. In the course of this work he travelled considerably, attended conferences with those giving contracts, searched for suppliers who could deliver materials to meet contract specifications, and visited mills. His work involved a large quantity of correspondence, telegraphing, and long distance telephoning. Richardson devoted all of his time to this work. He made use of his contacts with suppliers and of his twenty-four years of experience in the business. There was no other person in the organization of the petitioner who could do the work in all of its details and aspects other than Richardson. Both the obtaining of contracts and the servicing of them were complicated. The servicing of contracts, in general, related to working out deliveries and freight charges, and solving problems which arose in connection with meeting delivery *361 dates and arranging with railroad companies for railroad cars for shipping. The forms which had to be used in making bids were varied and the proper making of bids for Government orders required time, skill, conferences, and revisions, as well as filling in and filing the administrative forms of several administrative agencies of the Government which administered price control, transportation, labor, and other Federal laws. As the Government's needs for box shooks were great during 1943 and 1944, and demand exceeded supply, orders under contracts were not difficult to obtain, but Richardson had much difficulty in locating suppliers and working out arrangements for deliveries. During the taxable years, Richardson located new sources of supplies of box shooks in Maine, New Hampshire and other areas, and, also, in 1943 he increased the quantity of business with some mills he had contacted in 1942. He visited mills to ascertain their actual and potential inventories of stock and ability to produce. He had to locate "dry" material, of which there was a shortage. He sometimes had to assist mills by appealing to Government agencies to allow them more gasoline and supplies and to give services *362 in mediating labor disputes. In one instance he arranged for financing a mill's operations through an R.F.C. loan and a bank loan. He had to handle rejections of unsatisfactory box shooks and complaints. Many of the difficulties encountered by Richardson in his work in 1943 and 1944 were due to problems of the war economy which did not exist before or after the war period. Among the Government contracts which Richardson obtained for suppliers under competitive bidding in 1943 and 1944 were contracts of the Signal Corps in Philadelphia, the Jersey City Quartermaster, and the Medical depots at St. Louis, Toledo and Savannah. Government contracts were for carload quantities of materials in the number of 30, 35, 50, 75, and 100 carloads. Contracts which Richardson negotiated in 1943 with the Philadelphia Signal Corps totalled $226,283, and involved 100 carloads of box shooks. During 1943 and 1944 some of the contracts which Richardson negotiated were cancelled later, but these required his services and time. Also, in these years, he received repetitions and increases of prior orders which involved less work on his part than had been involved in obtaining the original contracts, and *363 it was necessary only to duplicate and copy the forms of the original contracts. Richardson has negotiated contracts with Government departments since 1923 and is thoroughly familiar with bidding and negotiation procedures. His duties in 1943 and 1944 were, in general, the same as they had been in 1942 and prior years, but the extent and volume of his work was greater in 1943 and 1944. He did 50 per cent more traveling in the taxable years than in prior years, and the volume of his correspondence, telephone and telegraph messages was greater. It is customary in the box shook business to pay salesmen commissions at the rate of at least 5 per cent of the gross dollar amounts of their sales. Ultimate Findings of Fact. A reasonable allowance for compensation of Richardson for his services was $46,500 in 1943, and $49,400 in 1944. Opinion The question is to determine the amounts of a "reasonable" allowance 1943 and 1944 for the compensation for Richardson's services in each year for the purpose of deductions by the petitioner corporation under section 23 (a) (1) (A) of the Code. The only reason given by the respondent for his disallowance of part of the compensation paid to *364 Richardson in each year is that the total amounts paid exceeded a "reasonable" allowance in each year. From all of the evidence adduced at the trial of this proceeding it has been found as a fact that the entire amount paid to Richardson in each of the taxable years represented a reasonable allowance for compensation for his services. The petitioner is engaged in a personal service business, and the bulk of its earnings consists of commissions which are paid by producers of box shooks for Richardson's services in negotiating and obtaining contracts for them for the sale of their materials. The amounts of commissions received by the petitioner corporation in 1943 and 1944 were greatly larger than it had received in prior years because the total of the dollar amounts of all of the contracts which Richardson negotiated and obtained in 1943 and 1944 was very much larger than in prior years. The demand for box shooks increased greatly in 1943 and 1944 because of the buying during the war period by Government agencies and departments of large quantities of box shooks for making wooden boxes. However, the petitioner had no commodity to sell, and its increased receipts of commissions were *365 due very largely to the personal efforts, the experience, the skill, and the contacts of Richardson. Richardson had expert knowledge of the sources of supply and of the grades and qualities of box shooks, as well as of the requirements of Government departments, and of the entire procedure of bidding for and working out Government contracts. He was an intermediate agent between the suppliers and manufacturers of box shooks and the buyers, and he had the confidence of both groups. However, the negotiation of a larger amount, in dollar value and number, of contracts in 1943 and 1944 was not done without considerable and increased effort on Richardson's part. Even though the demand was greatly increased by the war purchasing of the Government, it cannot be said that the increase in the volume of business which Richardson, as a selling agent, obtained, and the resulting increase in the income of the petitioner corporation, occurred automatically, or easily, or without increase in the work of Richardson in 1943 and 1944, as compared with prior years. Likewise, although Richardson was paid by petitioner almost three times as much as he was paid in 1943, and roughly twice as much as he was *366 paid in 1942, his efforts and work were greater. It cannot be concluded from the evidence that Richardson did not earn the compensation which the petitioner paid to him. There is considerable evidence about the complexity and the variety of the services which Richardson performed as an agent, both in obtaining contracts and in servicing them after they were obtained. Also, Richardson acted as an agent for several sellers of box shooks and the contracts which he obtained for them were with several Government agencies and departments. The servicing of the contracts was not a routine or simple matter. Furthermore, although buyers for the Government were anxious to give contracts for box shooks, they had a variety of specifications as to quality, dryness of wood, and the size and thickness of the box shooks. Richardson, as a sales agent, could not get Government contracts unless he could locate mills who could supply, according to specifications, the required materials; and in locating sources of supplies, Richardson had to travel and had to go through mills and examine their actual and potential stocks. The servicing of the contracts involved additional work by Richardson in such matters *367 as checking on deliveries and complaints. The evidence shows clearly that the handling by Richardson of a larger number of contracts in 1943 and 1944, which involved greater quantities of box shooks required the expenditure by him of more effort and time than in prior years, and that he earned the compensation which petitioner paid him. The petitioner had the burden of proving that $46,500 in 1943, and $49,400 in 1944 represented "reasonable" allowances for compensation of Richardson for his services within the intendment of section 23 (a)(1)(A). In meeting its burden of proof, the petitioner presented three witnesses who are executives of corporations which are engaged in the business of both manufacturing and selling, or of selling box shooks. One of the witnesses testified that it is the usual practice in the industry to pay salesmen commissions at the rate of from 5 to 8 per cent of the gross dollar amounts of their sales; and two witnesses testified that it is customary to pay selling commissions at the rate of 5 per cent. Analysis of other evidence reveals that the total compensation - $46,500 in 1943 and $49,400 in 1944 - represents 5 per cent of the total dollar amount of *368 the contracts which Richardson, as agent, negotiated in 1943; and 4.9 per cent of the total dollar amount of the contracts which he negotiated in 1944. [1] Since Richardson could have earned compensation at the rate of at least 5 per cent of the gross dollar amounts of sales negotiated by him if he had been employed by some other concern in the industry, payment for his services by the petitioner at the same rate is reasonable. It is held that the respondent erred in disallowing deductions in the taxable years of part of the compensation which petitioner paid to him. Because of some minor, uncontested adjustments which the respondent *369 has made, it appears that a Rule 50 recomputation is necessary. Decision will be entered under Rule 50. Footnotes
1. The carload shipments of box shooks covered by contracts which Richardson negotiated amounted to 92 per cent in 1943, and 86 per cent in 1944 of total carload shipments covered by total contracts on which petitioner received commissions, which contracts were for the total amounts of $1,000,428 in 1943, and $1,169,860 in 1944. A fair estimate of the gross dollar amount of the contracts which Richardson negotiated, based upon the above, is at least $920,394 in 1943, and $1,006,080 in 1944; of which $46,500 is 5 per cent, and $49,400 is 4.9 per cent.↩